Filed 8/3/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re Miguel J., a Person Coming Under the Juvenile Court Law. | B339932 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>E.J.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. 24PSJP00031A) |

APPEAL from orders of the Superior Court of Los Angeles County.  Stacy Wiese, Judge.  Affirmed.

Rita Himes, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

_____

**INTRODUCTION**

E.J. (Father) appeals from the juvenile court's jurisdictional findings and dispositional order, declaring his minor child, Miguel J., a dependent of the court under Welfare and Institutions Code section 300,[1] subdivisions (a) and (b), and removing the child from Father's custody. As to the jurisdictional findings, Father argues the juvenile court erred in exercising jurisdiction under section 300, subdivision (a), based on the parents' domestic violence because that subdivision does not apply to accidental harm that is inflicted on a child during a physical altercation between the parents. Father also asserts the language of the sustained section 300 petition does not accurately reflect that his physical contact with Miguel during a domestic violence incident with the child's mother was accidental. As to the dispositional order removing Miguel from his custody, Father contends there was no substantial evidence that the child was at risk of serious physical harm if returned to Father's care.

In our original opinion filed on September 22, 2025, we affirmed the jurisdictional findings and dispositional order. We concluded the evidence was sufficient to support jurisdiction under section 300, subdivision (a), and the language in the sustained petition adequately reflected the juvenile court's factual findings. We further concluded there was substantial evidence to support the order removing the child from Father.

Following the issuance of our original opinion, we granted Father's petition for rehearing and invited supplemental briefing on the proper interpretation of the mental state required for a

---

[1] Unless otherwise stated, all further undesignated statutory references are to the Welfare and Institutions Code.

jurisdictional finding under section 300, subdivision (a). After considering the supplemental briefing and oral argument of the parties, we hold that section 300, subdivision (a), may apply to domestic violence between a child's parents where one parent intentionally engages in an act of violence against the other parent in the child's presence, and the child's exposure to such violence either inflicts serious physical harm upon the child or places the child at risk of serious physical harm. We further hold that the juvenile court properly asserted jurisdiction under section 300, subdivision (a), based on Father's intentional acts of domestic violence against Miguel's mother while she was pregnant with Miguel or holding the child in her arms. We accordingly affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Section 300 petition

Father and Maria O. (Mother) are the married parents of Miguel, a boy born in November 2023. On March 10, 2024, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging that the police were called to the family's home due to a domestic violence incident. According to the reporting party, after Father arrived home that morning highly intoxicated, Mother confronted him about his drinking. During a physical altercation between the parents, Father accidentally struck Miguel in the face while Mother was holding the child in her arms. Miguel did not sustain any injuries. As the parents continued to argue, Mother cut her foot on a glass object that fell to the floor. She also suffered a laceration to her lip when Father slapped her. After the police arrived, Mother was granted an emergency protective order, but she did not want Father to leave the home because she relied on him to pay rent.

3

Father was arrested for domestic violence and child endangerment. In her statement to the police, Mother reported that Father used his hands to pull her, push her, and hit her approximately five times in the face, and that at some point during the altercation, he accidentally slapped the child.

In a March 19, 2024 interview with DCFS about the domestic violence incident, Mother indicated that she was upset because Father had been out drinking, which he often did on weekends. According to Mother, when Father came home, they began arguing in the bedroom while she was holding Miguel. Father slapped Mother in the face. Father also accidentally hit Miguel in the face with an open hand when he hit Mother, but he did not injure the child. After Mother placed Miguel on the bed, she and Father continued fighting. Father struck Mother in the face, head, and other parts of her body, and she fought back to defend herself. At one point, Mother tried to call the police, but Father took away her cell phone. She also attempted to open the window coverings to call outside for help, but Father kept her from doing so. Mother sustained a cut on her foot when she stepped on a broken ceramic mug. She then ran out of the home, and upon seeing Mother, the apartment manager called the police. After receiving medical treatment, Mother stayed at a shelter with Miguel and obtained a seven-day protective order. The following week, both Mother and Father returned to the family's home.

In her initial interview with DCFS, Mother also described prior acts of domestic violence perpetrated by Father. She recounted that, on December 24, 2023, Father slapped her multiple times in the face with an open hand while she sat on the bed breastfeeding Miguel. On that occasion, Father was drunk

4

and upset that Mother did not prepare a holiday dinner.  Mother also reported that Father slapped her several times when she was pregnant with Miguel.  Mother did not believe, however, that Father would hurt her after their most recent altercation because he started to attend church and promised not to drink again.  In describing the domestic violence between her and Father, Mother did not claim that Father ever targeted Miguel when he hit her.

In a March 22, 2024 interview with DCFS, Father stated that, the night before the domestic violence incident, he drank several beers and used a small amount of methamphetamine.  He slept on the floor, and then tried to crawl into the bed with Mother and Miguel the next morning.  In response, Mother began to kick Father and yell at him for coming home late.  She also scratched Father, ripped his shirt, and attempted to pull the blinds from the bedroom window.  Mother cut her foot when she broke a ceramic item and stepped on the broken pieces.  Father initially denied hitting Mother during the incident.  However, when DCFS referenced the police report documenting that Mother was seen bleeding from her lip, Father admitted that he slapped her.  In response to DCFS's inquiry about whether he struck Miguel while slapping Mother, Father said that he had no recollection of hitting the child.  Father further denied any prior incidents of domestic violence.  During the interview, Father agreed to submit to an on-demand drug test, which was negative for drugs and alcohol.

On April 2, 2024, DCFS filed a dependency petition for Miguel.  As later amended, the petition alleged Miguel was at substantial risk of harm under section 300, subdivisions (a) and (b), based on the parents' history of violent altercations in the child's presence.  It also alleged Miguel was at substantial risk of

5

harm under section 300, subdivision (b), based on Father's abuse of methamphetamine and alcohol.

On April 17, 2024, the juvenile court held a detention hearing for Miguel. At the request of Father's counsel, the court admitted into evidence a letter showing that Father enrolled in a domestic violence program two days earlier. The court detained Miguel from Father and released the child to Mother. The court also ordered monitored visitation for Father to take place outside the family's home. The court set an adjudication hearing on the section 300 petition.

## 2.    Jurisdictional and dispositional report

For its jurisdiction/disposition report, DCFS conducted additional interviews with Father and Mother about the allegations in the petition. In his interview, Father again indicated that Mother was the aggressor in the March 2024 domestic violence incident. As described by Father, Mother kicked him out of the bed because she was upset that he drank alcohol the night before. She later grabbed him by his shirt, scratched his back, and threw a ceramic mug onto the floor. Mother also pulled down the window curtains, and Father had to cover Miguel so that the curtains did not hit him. Father admitted that he slapped Mother during their altercation, but stated that "it wasn't much." He maintained that he did not hit Miguel. He further denied that there were any other incidents of domestic violence between him and Mother. However, Father later stated that sometimes he would "move her to the side" when Mother hit him, but he could not recall when this occurred. While Father acknowledged that he used to drink alcohol and use methamphetamine, he asserted he was always sober when he

arrived home.  He claimed that he had not used alcohol or drugs since the March 2024 incident.

In her interview, Mother stated that, during the March 2024 incident, she argued with Father because he stayed out all night and then arrived home smelling of alcohol.  She admitted that she kicked Father out of the bed and hit him on his back in anger.  She also admitted that she threw a cup onto the floor and cut her foot on the broken pieces.  Mother asserted that she and Father each slapped the other during the altercation, but she denied that he ever hit Miguel.  She claimed that she lied to the police when she told them that Father accidentally hit Miguel because she was afraid they would take the child away.  Mother further denied that they previously engaged in domestic violence, and asserted that she lied to the social worker about any prior altercations because she was angry at Father.  Mother indicated that she knew Father drank alcohol, but was not aware that he used drugs.  While Mother planned to continue the relationship, she acknowledged that Father needed to remain sober in order to return to the family's home.

DCFS also spoke with a maternal uncle and a paternal uncle who resided in the home.  Neither relative was aware of any domestic violence between the parents prior to the March 2024 incident.  In its report, DCFS noted that both Father and Mother were participating in domestic violence programs, and that Father continued to test negative for drugs and alcohol.  Father was appropriate and attentive to Miguel during his monitored visits, but he was not consistent in his visitation.  DCFS further noted that, despite Mother's recent denials, she disclosed that Father accidentally hit Miguel during the March 2024 incident in her prior statements to law enforcement, the

hospital social worker, and the medical hub clinic that examined the child. The hospital social worker also reported that, on the day of the incident, Miguel's face appeared to be red from being hit, and that Mother admitted this was not the first time Father hit her while she was holding the child. DCFS recommended that the juvenile court sustain the petition, remove Miguel from Father, and order services for both parents.

### 3. Jurisdictional and dispositional hearing

On June 12, 2024, the juvenile court held a combined jurisdictional and dispositional hearing. Counsel for DCFS and counsel for Miguel joined in asking the court to sustain the domestic violence counts in the petition under section 300, subdivisions (a) and (b), and the substance abuse count under subdivision (b). As to the domestic violence counts, counsel for DCFS argued that the child was within a zone of danger during the parents' physical altercations because Father actually hit Miguel during the March 2024 incident, and Mother disclosed there were other occasions when Father hit her while she was holding the child in her arms. As to the substance abuse count, counsel for DCFS asserted that Father admitted to using alcohol and methamphetamine the night before the March 2024 incident, and that Mother disclosed the domestic violence occurred when Father was under the influence of alcohol.

Mother's counsel requested that the court dismiss the domestic violence counts in the petition because Mother's most recent statements to DCFS showed that the March 2024 incident was an isolated occurrence, that Miguel was never hit or placed within a zone of danger, and that Mother acted appropriately by calling the police and taking the child with her to a shelter. Father's counsel asked the court to dismiss the petition in its

8

entirety. As to the domestic violence counts, Father's counsel argued that Mother admitted she lied when she initially claimed that Father hit Miguel during the March 2024 incident and engaged in other acts of domestic violence against her. Father's counsel also asserted that, while both parents admitted to slapping one another during the March 2024 incident, Mother instigated the altercation because she was angry at Father for staying out all night. As to the substance abuse counts, Father's counsel argued that there was no nexus between Father's drug use and a risk of harm to Miguel because Father never cared for the child while he was under the influence of alcohol or drugs.

After hearing the argument of counsel, the juvenile court sustained the domestic violence counts in the section 300 petition under subdivisions (a) and (b) of the statute, and the substance abuse count under subdivision (b). The court found Mother's initial description of the March 2024 altercation, including her statement that Father accidentally slapped Miguel when he slapped her, to be "extremely credible." The court also credited Mother's initial account that Father committed other acts of domestic violence against her when she was pregnant with Miguel and later when she was breastfeeding the child. In addition, the court found that Father's use of alcohol and methamphetamine was a "direct link to the abuse that was caused in this case" because Father was under the influence of those substances when he engaged in the March 2024 altercation with Mother.

Turning to disposition, the juvenile court declared Miguel a dependent of the court under section 300, subdivisions (a) and (b), removed the child from Father's custody, and released him to Mother under the supervision of DCFS. The court ordered family

maintenance services for Mother and enhancement services for Father. Father's case plan included drug and alcohol testing, a 52-week domestic violence program, parenting education, and individual counseling to address case issues.

On August 12, 2024, Father filed an appeal from the jurisdictional findings and dispositional order.

## 4. Postappeal orders

Father requests this court take judicial notice of various documents that he asserts are related to whether his appeal is moot. We grant Father's request for judicial notice of the juvenile court's December 13, 2024, and March 14, 2025 minute orders in this case, but deny the request as to the remaining documents because they are not relevant to the mootness issue. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).) These orders reflect that, at a six-month review hearing held on December 13, 2024, the juvenile court returned Miguel to both parents under the continued jurisdiction of the court. Then, on March 14, 2025, the juvenile court terminated dependency jurisdiction over Miguel with the child remaining in the custody of both parents.

## DISCUSSION

On appeal, Father challenges the jurisdictional findings based on his domestic violence with Mother and the order removing Miguel from his custody. Father argues the domestic violence count under section 300, subdivision (a), must be set aside because accidental harm inflicted on a child during an altercation between the parents does not support jurisdiction under subdivision (a) of the statute. Father further asserts the sustained domestic violence counts under both subdivisions (a) and (b) of the statute must be modified because they do not adequately reflect that his contact with Miguel during the

10

March 2024 altercation with Mother was accidental. In addition, Father contends the removal order was not supported by substantial evidence that showed a high probability that Miguel was at risk of serious harm if returned to Father's care. We conclude that none of Father's claims has merit.

**1.      Mootness of Father's appeal**

We first address Father's argument that his appeal is not moot. "A case becomes moot when subsequent events ' "render[] it impossible for [a] court, if it should decide the case in favor of [the appellant], to grant him any effect[ive] relief." ' " (*In re D.P.* (2023) 14 Cal.5th 266, 276.) While an order terminating jurisdiction generally renders an appeal from a prior order in a dependency proceeding moot, " 'dismissal for mootness in such circumstances is not automatic.' " (*In re T.R.* (2024) 107 Cal.App.5th 206, 214.) Rather, a reviewing court must " ' "decide on a case-by-case basis whether subsequent events in a juvenile dependency matter make a case moot and whether [its] decision would affect the outcome in a subsequent proceeding." ' " (*In re D.P.*, at p. 276.) Even where a case is moot, the court has discretion to reach the merits if the challenged order " 'could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings,' or ' "could have other consequences for [the appellant], beyond jurisdiction." ' " (*Id.* at p. 285.)

Here, the juvenile court made jurisdictional findings that Father does not challenge on appeal. Moreover, the court has since returned Miguel to Father's custody and terminated its jurisdiction over the child. Father nevertheless contends his appeal is not moot because (1) the challenged findings could permit a bypass of reunification services if Miguel or another

11

child of Father is removed for physical abuse in a future dependency case; and (2) DCFS likely will refer Father for inclusion in the Child Abuse Central Index (CACI) based on the challenged findings in this case.

As the California Supreme Court recently held, a parent's appeal from a jurisdictional finding is not moot where the parent shows that the allegation underlying the finding is subject to inclusion in the CACI, even if a CACI report has not yet been made. (*In re S.R.* (2025) 18 Cal.5th 1042, 1048, 1053.) In this case, DCFS concedes Father's appeal should not be dismissed as moot because a CACI report could be made in the future based on the sustained allegations in the current petition. Under these circumstances, we agree that Father's appeal is not moot.

## 2. Jurisdictional findings based on the parents' domestic violence

In exercising jurisdiction over Miguel, the juvenile court sustained the following language in counts a-1 and b-1 of the section 300 petition: "[Mother and Father] have a history of engaging in violent altercations, in the child's presence. On 03/10/2024, the father repeatedly struck the mother's face with the father's hand, pushed and pulled the mother and pulled the mother's hair, while the mother held the child, resulting in the father striking the child's face. The mother sustained a bleeding laceration to the mother's lip. On 12/23/2023, the father repeatedly struck the mother's face with the father's hand. On prior occasions, the [father] struck the mother with the father's hand, when the mother was pregnant with the child. On 03/10/2024, the mother pulled the father's shirt, scratched and kicked the father, inflicting scratch marks to the father's face and neck. The mother struck a dresser during the violent altercation,

12

causing a mug to fall to the ground and break, resulting in the mother stepping on the broken glass, inflicting an injury to the mother's foot.  On 03/10/2024, the father was arrested for Inflict Corporal Injury Spouse/Cohabitant/Dating Relationship and Child Abuse:  Great Bodily Injury/Death.  Such violent conduct on the part of the mother and the father endangers the child's physical health and safety, creates a detrimental home environment and places the child at risk of serious physical harm, damage and danger."

### 2.1   Governing law

Section 300, subdivision (a), provides that a child comes within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent." (*Ibid*.)  Under section 300, subdivision (b), the juvenile court may assert jurisdiction if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of … [¶] … [t]he failure or inability of the child's parent … to adequately supervise or protect the child." (*Id*., subd. (b)(1)(A).)  "Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. [Citations.]  The court may consider past events in deciding whether a child presently needs the court's protection." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601–602 (*Cole L.*).)  " 'A parent's " '[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." ' " (*In re J.A.* (2020) 47 Cal.App.5th 1036, 1048.)

13

We review challenges to the sufficiency of the evidence underlying jurisdictional findings for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) " ' "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." ' " (*Ibid*.)

### 2.2 Substantial evidence supported jurisdiction under section 300, subdivision (a)

Father argues count a-1 in the sustained petition must be set aside because section 300, subdivision (a), requires the nonaccidental direct application of force upon the child by the parent, whereas Father's only direct application of force against Miguel during the domestic violence incidents with Mother was accidental. DCFS asserts section 300, subdivision (a), does not require that the parent specifically intend the consequences of his or her violent acts, and Father's act of striking Miguel during a violent attack on Mother was sufficient to support jurisdiction under subdivision (a) of the statute. We conclude section 300, subdivision (a), may apply to domestic violence between a child's parents where one parent intentionally engages in an act of violence against the other parent in the child's presence, and the child's exposure to such violence either inflicts serious physical harm upon the child or places the child at risk of serious physical harm. We further conclude the evidence in this case was sufficient to support jurisdiction under section 300, subdivision (a), because the juvenile court reasonably could find that Father's intentional acts of violence against Mother while she was

14

pregnant with Miguel and/or holding Miguel in her arms placed the child at risk of suffering serious physical harm.

" ' " 'When we interpret a statute, "[o]ur fundamental task … is to determine the Legislature's intent so as to effectuate the law's purpose.  We first examine the statutory language, giving it a plain and commonsense meaning.  We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment.  If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.  If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy."  [Citation.]  "Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose." ' " ' "  (*In re N.R.* (2023) 15 Cal.5th 520, 538–539 (*N.R.*).)

Section 300, subdivision (a), authorizes jurisdiction where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian."  (*Ibid*.)  Neither section 300 nor any other provision within the statutory scheme for dependency proceedings defines the term "nonaccidentally" or "nonaccidental."  While the term does not appear in any of the leading dictionaries that we consulted, "accidental" is generally defined as "unintentional."  (See, e.g., American Heritage Dict. (5th ed. 2022) <https://www.ahdictionary.com/word/search.html?q

15

=accidental> [as of July 20, 2026] [defining "accidental" as "[o]ccurring unexpectedly, unintentionally, or by chance"]; Merriam-Webster Dictionary (2026) <https://www.merriam-webster.com/dictionary/accidental> [as of July 20, 2026] [defining "accidental" as "occurring unexpectedly or by chance" or "happening without intent or through carelessness and often with unfortunate results"]; Oxford English Dictionary (2026) <https://doi.org/10.1093/OED/2445581469> [as of July 20, 2026] [defining "accidental" as "[t]hat happens by chance, unintentionally, or unexpectedly"]; Black's Law Dictionary (12th ed. 2024) <https://www.westlaw.com/Document/Ifd1be683808411e4b391a0bc737b01f9/View/FullText.html?transitionType=Default&contextData=(sc.Default)&VR=3.0&RS=cblt1.0> [as of July 20, 2026] [defining "accidental" as "[n]ot having occurred as a result of anyone's purposeful act"].) It is thus reasonable to infer that the plain meaning of the term "nonaccidentally" is "intentionally."

Interpreting "nonaccidentally," as used in section 300, subdivision (a), to mean "intentionally" is consistent with the California Supreme Court's description of this provision in *In re R.T.* (2017) 3 Cal.5th 622 (*R.T.*). In *R.T.*, the Supreme Court considered whether subdivision (b)(1) of section 300 required a finding that a parent was neglectful or otherwise blameworthy for the " 'failure or inability' " to adequately supervise or protect his or her child. (*R.T.*, at p. 624.) In concluding that parental culpability was not required, the Supreme Court distinguished section 300, subdivision (b)(1) from surrounding provisions in the statute, explaining that "several provisions in section 300 require that *a parent have acted intentionally or willfully* to support a juvenile court's dependency jurisdiction. (See § 300, subds. (a) [parent 'inflicted nonaccidentally' 'serious physical harm' on

16

child], (c) [child is suffering, or is at substantial risk of suffering, serious emotional damage 'as a result of the conduct of the parent'], (d) [parent's sexual abuse of child], (e) [child under five years old has suffered 'severe physical abuse' by parent], (i) [child subjected to act(s) of cruelty by parent].)" (*R.T.*, at pp. 629–630, italics added.) Because section 300 did not define the statutory terms at issue, the Supreme Court also considered the common meaning of those terms as defined in the dictionary, recognizing that "[a]lthough not binding, it can be useful to refer to the dictionary definition of a word in attempting to ascertain the meaning of statutory language." (*R.T.*, at p. 627.) Here, considering the common meaning of the term "nonaccidentally," as well as this guidance from the Supreme Court, we construe section 300, subdivision (a), as requiring an intentional act on the part of the parent.

However, that does not end the analysis. While section 300, subdivision (a), requires that a parent act intentionally, acts of domestic violence are, of course, intentional. The question in this case is whether the parent's intentional act of violence must be directed at the child, and not at the child's other parent, to support jurisdiction under subdivision (a). None of the provisions in section 300 specifically identify domestic violence between a child's parents as a basis for dependency jurisdiction. Rather, " '[s]ection 300 defines jurisdiction in terms of serious harm suffered by a child or the substantial risk of such serious harm to a child. Although the harm or risk of harm to the child must generally be the result of an act, omission or inability of one of the parents or guardians, the central focus of dependency jurisdiction is clearly on the child rather than the parent.' " (*R.T.*, *supra*, 3 Cal.5th at p. 626.) On appeal, Father

17

does not dispute that the juvenile court properly asserted jurisdiction under section 300, subdivision (b), based on Father's domestic violence against Mother.  Father contends, however, that jurisdiction was not proper under section 300, subdivision (a), because the Legislature intended subdivision (a) to be limited to abuse, and subdivision (b) to more broadly apply to neglect.

Section 300 was amended in 1987 to add subdivisions (a) through (j), setting forth 10 specific grounds for declaring a child a dependent of the juvenile court.  (Stats. 1987, ch. 1485, §§ 4, 4.5, pp. 5603–5605.)  " 'The purpose of this change was to limit court intervention to situations in which children are threatened with serious physical or emotional harm in an effort to ensure more uniform application of the law.' " (*R.T.*, *supra*, 3 Cal.5th at p. 631.)  As our Supreme Court explained, the amended language "was developed by a task force that had been charged by statute with reviewing the laws relating to child abuse reporting, dependent children, and child welfare services, and had been directed to 'identify problem areas in the law' and recommend 'statutory revisions to strengthen and compliment the child welfare system in California.' [Citation.]  Among its findings, the task force determined that section 300, as it existed prior to 1987, provided 'very little guidance to investigating and petitioning agencies, to judges, attorneys or to parents as to what actions or harms justify state intervention. …' [Citation.]  The Legislature hoped that legislation developed by the task force would 'more clearly define the conditions under which a child could be removed from the family home.' " (*N.R.*, *supra*, 15 Cal.5th at p. 547.)

The legislative history further reflects that in defining the type of harm that would justify intervention under section 300,

18

subdivision (a), the task force sought to distinguish "physical abuse" from "corporal punishment." (See Sen. Select Com. on Children & Youth, SB 1195 Task Force Rep. on Child Abuse Reporting Laws, Juvenile Court Dependency Statutes, and Child Welfare Services (Jan. 1988) p. 6.) The task force explained that "[s]ection 300(a) specifies that in order for a court to assume jurisdiction, it must find that a child has been injured by a parent or that the child is at 'substantial risk' of injury," and that "corporal punishment ('spanking') of a child is not, in and of itself, grounds for intervention." (*Ibid.*) The task force did not, however, indicate that physical abuse was the only type of harm that was intended to be covered by subdivision (a). Nor did it address what subdivision applied where the harm to the child resulted from acts of domestic violence occurring in the child's presence. As our Supreme Court observed, in amending section 300, "the Legislature sought to clarify the grounds for assertion of dependency jurisdiction … . But it is also evident that the Legislature implemented its intent in a manner that would 'provide maximum protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to protect children who are at risk of that harm … .' [Citation.] Insofar as some bases for dependency jurisdiction could be precisely specified without depriving children of this protection, they were. But as a matter of necessity, some grounds for jurisdiction had to be phrased in more general terms." (*N.R.*, *supra*, 15 Cal.5th at p. 548.) As a result, despite the Legislature's intent to more clearly define the grounds for jurisdiction, no subdivision of section 300 speaks specifically to the risk of harm posed by domestic violence.

19

Although section 300 does not identify domestic violence as a ground for dependency jurisdiction, California appellate courts consistently have recognized that domestic violence that takes place in a child's presence may serve as a valid basis for declaring the child a dependent of the juvenile court. (See, e.g., *Cole L.*, *supra*, 70 Cal.App.5th at pp. 602–603; *In re Nathan E.* (2021) 61 Cal.App.5th 114, 121–122; *In re M.M.* (2015) 240 Cal.App.4th 703, 719–720 (*M.M.*); *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 598–601 (*Giovanni F.*).) "Although many cases based on exposure to domestic violence are filed under section 300, subdivision (b) [citations], section 300, subdivision (a) may also apply" under certain circumstances. (*Giovanni F.*, at p. 599; accord, *Nathan E.*, at pp. 121–122; *M.M.*, at p. 720.)

In *Giovanni F.*, for instance, the father's violent conduct included punching and choking the child's mother while he was driving a car and the child was in the backseat. (*Giovanni F.*, *supra*, 184 Cal.App.4th at p. 600.) Once the parents arrived home, they physically struggled over the child's car seat while the child was still in it. (*Ibid.*) On a prior occasion, the father also attacked the paternal grandmother while he was holding the child in his arms. (*Id.* at p. 599.) In concluding that jurisdiction was proper under section 300, subdivision (a), the Court of Appeal reasoned: "Domestic violence is nonaccidental. When it occurs in a moving vehicle, the potential for injury inherent in the violence is dramatically increased by the likelihood of a collision that could prove fatal. By driving with one hand on the steering wheel, and using his other hand to hit and choke [the mother], [the father] placed [the child], a passenger, at substantial risk of suffering serious physical harm. Any harm [the child] suffered would have resulted from [the father's]

20

nonaccidental conduct. [The father's] assertion that his behavior did not endanger [the child] is incorrect. His assertion that he did not intend to hurt [the child] is immaterial. [The father']s violence in the car would have been sufficient, by itself, to support jurisdiction under section 300, subdivision (a)." (*Giovanni F.*, at pp. 600–601.)

Similarly, in *M.M.*, the Court of Appeal concluded that the evidence was sufficient to support the juvenile court's finding that the parents' domestic violence placed their child at risk of serious harm under section 300, subdivision (a). (*M.M.*, *supra*, 240 Cal.App.4th at pp. 720–721.) In that case, the record showed that the child was not only present during a domestic violence incident between the parents, but that "he was 'at their feet' during most of the incident and that during some of the incident, father was actually holding [the child] while mother was hitting father and while father was choking mother." (*Id.* at p. 720.) On another occasion, the father pushed the mother when she was pregnant with the child, causing her to fall to the floor. (*Ibid.*) Although none of the violent conduct was directed at the child, the Court of Appeal determined that there was "ample evidence in the record to support the juvenile court's finding there was a substantial risk [the child] will suffer serious physical harm 'inflicted nonaccidentally' by mother or father." (*Ibid.*)

In *Cole L.*, the Court of Appeal also observed that, "[u]nder certain circumstances incidents of domestic violence between a child's parents, if they occur in the child's immediate presence, may support a jurisdiction finding under section 300, subdivision (a)." (*Cole L.*, *supra*, 70 Cal.App.5th at p. 603.) As an example, the court explained that "if a father strikes an infant's mother while she is holding the child or an older child intervenes during

a fight to protect her mother from her father's abuse, the risk of harm to the child may be properly viewed as nonaccidental." (*Ibid*.)  But the court then appeared to draw a distinction between domestic violence that occurs in "the child's immediate presence," and domestic violence that occurs in "the presence of bystander children."  (*Ibid*.)  The court stated that because "a finding under section 300, subdivision (a), requires evidence of a risk of physical injury 'inflicted nonaccidentally upon the child[,]' " "[a]n unintended injury to a bystander child that results from an intentional act directed at another—for example, due to an object thrown by one parent at another during an argument— does not satisfy that statutory requirement."  (*Ibid*.)  In drawing this distinction, the court criticized *Giovanni F.* and similar cases as "fail[ing] to recognize the fundamental difference between a failure to protect a child from the unintended consequences of intentional behavior and the deliberate (that is, 'nonaccidental') infliction of injuries upon the child … ."  (*Cole L.*, at p. 603, fn. 7.)

However, under *Cole L.*'s analysis, it is unclear why a child at risk of being struck by a parent while being held in the other parent's arms would fall under section 300, subdivision (a), while a child at risk of being struck by an object thrown by one parent at the other would fall under subdivision (b).  In both cases, there is a risk of an unintended injury to the child that results from an intentional act directed by the parent at another, while the child is present in the room and close enough to the violent act to be at substantial risk of serious physical harm.  We therefore disagree with *Cole L.* to the extent it holds that an unintended injury to a bystander child as a consequence of his or her exposure to domestic violence can never serve as a valid basis for jurisdiction under section 300, subdivision (a).  Instead, consistent with

22

*Giovanni F.* and *M.M.*, we conclude that where a parent intentionally engages in violent conduct toward the other parent in the child's presence, and the child's exposure to that conduct either inflicts serious physical harm upon the child or places the child at risk of serious physical harm, then jurisdiction may be proper under subdivision (a) of the statute, even if it is also valid under subdivision (b). While the exact location of the child relative to the act of violence (i.e., in the same room, at a parent's feet, in a parent's arms) may be a significant factor to consider in assessing the risk of harm posed to the child, the totality of the circumstances ultimately will determine whether the child's exposure to domestic violence supports jurisdiction under section 300, subdivision (a).

The concurrence interprets section 300, subdivision (a), as requiring that the parent act with a specific mental state with respect to the child. Relying on the four mental states—purpose, knowledge, recklessness, and negligence—set forth in the Model Penal Code, the concurrence adopts recklessness as the one that best aligns with the term "nonaccidentally" as used in section 300, subdivision (a). However, when a parent commits domestic violence in the presence of the child, that conduct may place the child at risk of serious physical harm regardless of whether the parent's mental state with respect to the child was purposeful, knowing, reckless, or negligent. Of course, depending upon the facts of the case, the parent's conduct in exposing the child to domestic violence will often meet the definition of recklessness as that term is commonly understood. In both *Giovanni F.* and *M.M.*, for example, the parents engaged in conduct that could be properly described as reckless, but neither decision suggested that a parent must act with a specific mental

state with respect to the child to warrant jurisdiction under section 300, subdivision (a). Rather, both decisions focused on the risk of harm that the child faced as a consequence of the parent's intentional act of violence toward the other parent. (*Giovanni F.*, *supra*, 184 Cal.App.4th at pp. 599–601; *M.M.*, *supra*, 240 Cal.App.4th at pp. 720–721.) Moreover, it has been over a decade since *Giovanni F.* and *M.M.* were decided, and the Legislature has not amended section 300, subdivision (a), to clarify the meaning of the term "nonaccidentally" or to impose a mental state requirement on the parent's conduct with respect to the child. Unless and until the Legislature sees fit to amend section 300, subdivision (a), to provide that the parent's mental state must have at least been reckless with respect to the injury to the child, we decline to read such a requirement into the statute.

In this case, the juvenile court reasonably could find that Father and Mother engaged in multiple acts of domestic violence in Miguel's presence, and that Miguel's exposure to those violent acts placed him at risk of suffering serious physical harm within the meaning of section 300, subdivision (a). In her initial account of the March 2024 incident, which the juvenile court found to be "extremely credible," Mother explained that she was holding Miguel in her arms during the altercation, and that Father accidentally hit the infant in the face with an open hand when he hit Mother. Mother also disclosed that the March 2024 altercation was not the first instance of domestic violence between the parents. In her initial interview with DCFS, Mother reported that Father slapped her several times when she was pregnant with Miguel. Mother also recounted that, in December 2023, Father repeatedly hit her with an open hand while she was

24

breastfeeding Miguel because he was upset that she did not prepare a holiday dinner. When Mother spoke with the hospital social worker shortly after the March 2024 altercation, she similarly disclosed that there were other occasions when Father hit her while she was breastfeeding or holding the baby.

Accordingly, the domestic violence that occurred in this case falls squarely within the type of conduct that may support a finding of jurisdiction under section 300, subdivision (a). (See *Cole L.*, *supra*, 70 Cal.App.5th at p. 603; *M.M.*, *supra*, 240 Cal.App.4th at p. 720; *Giovanni F.*, *supra*, 184 Cal.App.4th at p. 601.) The evidence showed that Miguel was not merely present in the home when the parents engaged in violent physical altercations. Rather, the child was at risk of suffering serious physical harm during the altercations because Mother was pregnant with Miguel or holding him in her arms on occasions when Father hit her. While it is undisputed that Father did not target Miguel for abuse during any of the domestic violence incidents, the juvenile court found that Father accidentally slapped the child when he slapped Mother during the March 2024 altercation. Although Mother later recanted her statements that Father hit Miguel during that incident and committed prior acts of violence against her, the juvenile court found Mother's earlier accounts to law enforcement and DCFS to be more credible. As a reviewing court, " ' "[w]e do not reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts." ' " (*M.M.*, at p. 721.) On this record, the juvenile court's exercise of jurisdiction under section 300, subdivision (a), was supported by substantial evidence.

### 2.3 The sustained domestic violence counts do not require modification

Father asserts that, if this court affirms the jurisdictional finding under section 300, subdivision (a), we must modify the language of counts a-1 and b-1 to state that Father accidentally hit Miguel during the March 2024 incident. Father argues that such modification is necessary because the sustained language is ambiguous about whether the hit was accidental, and substantial evidence does not support a finding that Father nonaccidentally struck Miguel. DCFS contends that Father forfeited his claim by failing to request a modification in the juvenile court, and in any event, the sustained counts accurately reflect the court's findings. Even assuming, without deciding, that Father did not forfeit this claim by failing to object, we conclude that it lacks merit.

The sustained language in counts a-1 and b-1 states that "[o]n 03/10/2024, the father repeatedly struck the mother's face with the father's hand, pushed and pulled the mother and pulled the mother's hair, while the mother held the child, resulting in the father striking the child's face." In seeking a modification, Father claims that this language is ambiguous about whether his contact with Miguel's face was intentional or accidental. We disagree. The sustained counts do not suggest that Father was targeting Miguel when he struck the child in the face. Rather, language reflects that Father was targeting Mother, and that his act of striking Miguel resulted from Father striking, pushing, and pulling Mother while she was holding the child in her arms. This language was consistent with Mother's initial statements to the police and DCFS that Father used his hands to hit, push, and pull her during the March 2024 altercation, and that Father accidentally slapped the child in the face when he slapped

26

Mother. This language also was consistent with the factual findings made by the juvenile court at the jurisdictional and dispositional hearing. As the court found in crediting Mother's original account, "They got into a fight, she had Miguel, Father smacked her and, unfortunately, slapped Miguel in the process." Thus, while the sustained language in counts a-1 and b-1 did not include the word "accidental" in describing Father's contact with the child, it adequately reflects the evidence and findings at the hearing.

Father nevertheless contends that the domestic violence counts must be modified to protect him from unfair prejudice in a future dependency or CACI proceeding. For instance, he argues that, if Miguel or another child is removed from his custody in a future dependency case due to physical abuse, the juvenile court might misconstrue the sustained language in the current petition to imply that Father physically abused Miguel, and rely on such language to bypass reunification services for him under section 361.5, subdivision (b)(3).[2] Father also asserts that the domestic violence counts could be misconstrued as establishing that he engaged in conduct that constitutes child abuse or severe neglect that must be reported to CACI. However, Father's claim that the jurisdictional findings in this case might be misinterpreted in a hypothetical future case is purely speculative. The record reflects that, in sustaining counts a-1 and b-1 in the

_____

[2] Section 361.5, subdivision (b)(3), permits the bypass of reunification services if "the child or a sibling of the child has been previously adjudicated a dependent … as a result of physical or sexual abuse," and following the return of the child to parental custody, the child is again "being removed … due to additional physical or sexual abuse."

27

section 300 petition, the juvenile court found that Father struck Miguel in the face when he intended to strike Mother during a violent physical altercation between the parents. Because the sustained language in the petition is consistent with the findings and the evidence in this matter, no modification is necessary.

3. **Dispositional order removing Miguel from Father's custody**

   3.1 **Governing law**

   " 'At the dispositional hearing, a dependent child may not be taken from the physical custody of the parent under section 361 unless the court finds there is clear and convincing evidence there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned home, and that there are no reasonable means to protect the child's physical health without removing the child.' " (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1065.) In determining whether to remove a child, the court "may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.) The court "must also consider whether there are any reasonable protective measures and services that can be implemented to prevent the child's removal from the parent's physical custody." (*Ibid.*) "The parent need not be dangerous and the minor need not have been harmed before removal is appropriate. The focus of the statute is on averting harm to the child." *(In re T.W.* (2013) 214 Cal.App.4th 1154, 1163; accord, *In re D.B.*, at p. 328.)

   We also review challenges to the sufficiency of the evidence supporting dispositional orders for substantial evidence. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) "When reviewing a finding that

a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or orders." (*In re E.E.* (2020) 49 Cal.App.5th 195, 206.)

### 3.2 Substantial evidence supported the removal order

Father challenges the sufficiency of the evidence supporting the dispositional order removing Miguel from his custody. He contends that the evidence was insufficient to establish that there was a high probability that Miguel faced a substantial risk of harm if returned to Father's care, and that there were no reasonable means to protect the child other than removal. We conclude that the order removing Miguel from Father was supported by substantial evidence.

The evidence showed that Father and Mother had a history of violent physical altercations that placed Miguel at substantial risk of harm. These incidents of domestic violence between the parents included Father hitting Mother several times when she was pregnant with Miguel, Father hitting Mother while she was breastfeeding the baby in December 2023, and Father hitting Mother while she was holding Miguel during their March 2024 altercation, which resulted in Father accidentally hitting the then four-month-old baby in the face. As of the June 2024 jurisdictional and dispositional hearing, Father was participating in a domestic violence program and testing negative for drugs and alcohol. He also had moved out of the family's home to

29

comply with the juvenile court's detention order. However, throughout the dependency proceedings, Father continued to minimize his role in the domestic violence and to accuse Mother of being the aggressor in their physical altercations.

In his initial interview with DCFS, Father denied that he hit Mother during the March 2024 altercation, and only admitted to slapping her after the social worker pointed to the police report documenting that Mother was seen bleeding from her lip. In a subsequent interview, Father admitted that he slapped Mother during that incident, but he downplayed his conduct by asserting that "it wasn't much." Moreover, in each of his interviews with DCFS, Father denied that he hit Miguel, or engaged in any prior acts of domestic violence against Mother. While Mother initially reported that Father accidentally hit Miguel as he was hitting her during the March 2024 altercation, she later recanted these statements. Mother also recanted her statements that Father hit her on previous occasions when she was pregnant with Miguel or holding the baby in her arms.

On this record, the juvenile court reasonably could infer that, as of the jurisdictional and dispositional hearing, neither Father nor Mother had accepted responsibility for their actions in placing their young child at substantial risk of harm. The court also reasonably could infer that, since Mother and Father intended to maintain their relationship, there was a strong likelihood that the violence between them would continue. "Indeed, in a domestic violence situation, past violence is highly probative of the risk that violence may recur." (*In re L.B.* (2023) 88 Cal.App.5th 402, 411.) Moreover, "[a] parent's denial of domestic violence increases the risk of it recurring." (*In re V.L.* (2020) 54 Cal.App.5th 147, 156.) Under these circumstances,

there was substantial evidence to support the juvenile court's finding that Miguel would be at substantial risk of serious harm if returned to Father's care, and that removal was the only reasonable means of protecting the child from such risk.

## DISPOSITION

The jurisdictional findings and dispositional order are affirmed.


VIRAMONTES, J.


I CONCUR:


STRATTON, P. J.

**WILEY, J., Concurring in the result.**

The majority reasoning stretches the jurisdiction of the Department of Family and Children Services to an extent the Department has not requested and may never have imagined.  I doubt this unprecedented stretch is warranted.  The majority reasoning also creates two avoidable ambiguities:

1.      What is meant by "intentionally"?
2.      What is the required mental state regarding "the child's presence"?

I offer a preferable solution.

I

The majority apparently holds that the Department has jurisdiction under subdivision (a) of section 300 of the Welfare and Institutions Code if:

1.      One parent "intentionally" engages in an act of violence against the other parent;
2.      This parent engages in an act of violence in the child's presence, *with or without the violent parent's awareness of the child's presence*; and
3.      The child's exposure to such violence either inflicts serious physical harm upon the child or places the child at risk of serious physical harm, *even if the violent parent had no culpable mental state regarding the child.*

This holding is new.  No precedent has stated this rule in these terms.  Recognizing the novelty of this holding is not necessarily criticism, for this case requires us to break new ground in some way.  But I would prefer to break this ground in a way creating clarity rather than ambiguity.

1

## II

When defining the mental state this statute requires, we should be using the best tools for the job. We should avoid ambiguity, which is the problem we are supposed to be solving.

Our problem is to define the appropriate *mental state*, which is the plain English version of the Latin legalism *mens rea.* Mental state matters. Children know the difference between "I didn't mean to hurt you" and "I hurt you on purpose." Even dogs know it, wrote Holmes. (Holmes, The Common Law (1881) p. 3 ["even a dog distinguishes between being stumbled over and being kicked"].)

The actor's state of mind determines the level of culpability—which is to say blameworthiness. Issues about mental state routinely arise throughout the law because, in every field, differing levels of culpability can matter.

Our nation's finest legal minds have been whittling on this culpability stick for more than 70 years, and by now its point is good and sharp. We should take advantage of their efforts. It would benefit all Californians for judges to use state-of-the-art analysis to write precisely about mental state issues wherever they arise. Dependency law is no exception.

The majority's result is right. The analysis, however, can use the help the American Law Institute is offering.

When it comes to defining mental states, the gold standard is the Model Penal Code's four-part system: purpose, knowledge, recklessness, and negligence. (See *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 173 (*Cel-Tech*) ["four distinct culpable mental states": purpose, knowledge, recklessness, and negligence]; see Model Pen. Code, § 2.02 [precisely defining purpose, knowledge, recklessness, and

negligence]; Rest.(3rd) Torts:  Liability for Physical and Emotional Harm §§ 1–3 [further fine-tuning the definitions of purpose, knowledge, recklessness, and negligence].)

The basic idea is easy to grasp.  Four examples from this case's dependency law context illustrate the four grades of culpability, in decreasing order.

1. A father acts with *purpose* if his goal is to hit his child.

2. A father acts *knowingly* with respect to injuring the child if the father wants to hit the mother, she holds up the child as a shield, and the father swings through the child to get at the mother.  The father's purpose is not to hit the child, but the father knows his swing will strike the child.  The father might prefer his child remained uninjured, but he swings anyway.

3. A father acts *recklessly* with respect to injuring the child if the car mechanic tells the father that he should get the brakes serviced because they will fail soon, yet the father ignores the warning and drives away with the child as passenger.  At the first stoplight the brakes fail and the crash injures the child.  The father has disregarded a substantial risk of harm to the child that he either appreciated or that would have been obvious to another person in the father's situation.

4. A father acts *negligently* with respect to injuring the child if he drives but forgets to ensure the child's seat belt is buckled.  The father failed to take reasonable care.

That is the basic idea:  purpose, knowledge, recklessness, and negligence.

This basic idea started with the American Law Institute:  a non-partisan group of lawyers, judges, and professors dedicated

to law reform in the public interest.  "In the early part of the 1920's a group of prominent American judges, lawyers and law teachers, organized as 'The Committee on the Establishment of a Permanent Organization for the Improvement of the Law,' reported to the members of the legal profession that the 'two chief defects in American law are its *uncertainty* and its *complexity*.' " (Goodrich (1951) *The Story of the American Law Institute*, 1951 Wash. U.L.Q. 283, 283, italics added (hereafter Goodrich).)

The Institute held its first annual meeting in 1923.  Early leaders included Learned Hand, Benjamin Cardozo, Harlan Fiske Stone, Charles Evans Hughes, Arthur Corbin, John Henry Wigmore, Roscoe Pound, and Samuel Williston.  (Goodrich*, supra,* at p. 284; Gold & Gordon (2023) The American Law Institute:  A Centennial History 1 (hereafter *Centennial*).)

The Institute proved an enduring movement for legal reform, exemplary not only for its non-partisan influence, but also its longevity.  After a century, it remains an enterprise in full vigor, with an enormous number of projects completed and an impressive array of projects in forward motion.  (*Centennial*, *supra*, at pp. 7–8.)  Most lawyers and judges are familiar with the intellectual power, the legal authority, and the political neutrality of Institute works like the Restatements of Torts and Contracts.  Reporters on these projects were Prosser, Corbin, and Williston.  These are storied names in the law.

Early on, the Institute set its sights on the common law confusion over how to define culpability.  This work began in the context of criminal law, where the puzzlement was acute and the stakes are so high.  Before the advent of this effort, often "courts used epithets to identify the culpable state required, epithets such as willfully, maliciously, wantonly, or corruptly."  (Kadish,

*Fifty Years of Criminal Law:  An Opinionated Review* (1999) 87 Cal. L.Rev. 943, 952.)  The vagueness of these labels and others like them created a "long tradition of dizzying uncertainty … ." (*Ibid.*)  The Supreme Court of the United States echoed this criticism:  "The common law traditionally used a variety of overlapping and, frankly, confusing phrases to describe culpable mental states … ."  (*Voisine v. United States* (2016) 579 U.S. 686, 698, italics added (*Voisine*).)  This mental-state system was best described as "obscure."  (*Ibid.*)

"Obscure" is not good.  Law best serves the public when it is clear and precise.  Judges, when they write opinions deciding cases, should not make law obscure, for clarity and precision make law predictable and accessible to all.  Obscurity and ambiguity create uncertainty benefiting no one.

The American Law Institute proposed tackling this problem of obscurity in 1951.  (Ferzan, *From Restatement to Model Penal Code*, in *Centennial, supra,* at p. 299.)  The Model Penal Code, which the Institute promulgated in 1962, became widely influential.  It appeared in essentially every criminal law coursebook in widespread use in American law schools.  (*Id.* at 303; see *People v. Canales* (2024) 106 Cal.App.5th 1230, 1256, 1261–1262 (*Canales*) [surveying past generations of major criminal law casebooks].)

Today, online materials for law students explain this fundamental development:

"If the Common Law of mens rea was a misty landscape of vague terms like 'malice' and 'wickedness,' the Model Penal Code (MPC) is modern architecture:  crisp, functional, and rigorously structured.  [⁋]  For the aspiring lawyer, the transition to the MPC represents a shift from moral ambiguity to analytical

precision.  Under the Common Law, judges often asked, 'Did the defendant have a guilty mind?' broadly speaking.  The MPC rejects this holistic approach.  Instead, it demands Element Analysis.  It asks: ' What was the defendant's level of culpability specifically regarding the conduct, the result, or the surrounding circumstances?' "  (Lexplug, *Model Penal Codes Level of Culpability Outline* <https://www.lexplug.com/outlines/criminal-law/the-general-part-elements-of-a-crime/mens-rea-the-guilty-mind/model-penal-code-levels-of-culpability> [as of July 31, 2026], archived at <https://perma.cc/BB9Q-EW7G>.)

This four-part system—purpose, knowledge, recklessness, and negligence—was designed to solve the problem of statutory interpretation.  By standardizing the mental states into four precisely-defined hierarchical levels, this system sought to match legal consequences with the actor's exact state of mind in a predictable and user-friendly way.

The power of this analytical method impressed judges even in jurisdictions that had not legislatively enacted the Model Penal Code.  The federal government is a prime example: Congress, like the California Legislature, never passed the Model Penal Code.  Yet federal judges came to appreciate this four-part approach to *mens rea* was the leading *judicial* tool for improving precision when solving statutory mental-state problems.  Judges do not need legislative authorization to think and write clearly.

In 1969, for instance, the Supreme Court of the United States used this method "as a general guide" when interpreting a federal statute.  (*Leary v. U.S.* (1969) 395 U.S. 6, 46, fn. 93 [adopting the Model Penal Code's definition of "knowledge"].)

The high court later wrote that the Model Penal Code "enumerates four possible levels of intent—purpose, knowledge,

recklessness, and negligence." (*United States v. United States Gypsum Co.* (1978) 438 U.S. 422, 444.)

The court likewise explained that the ambiguity in past *mens rea* definitions led to the "new approach, exemplified in the American Law Institute's Model Penal Code, [which was] based on two principles. First, *the ambiguous and elastic term 'intent'* is replaced with a hierarchy of culpable states of mind. The different levels in this hierarchy are commonly identified, in descending order of culpability, as purpose, knowledge, recklessness, and negligence." (*U.S. v. Bailey* (1980) 444 U.S. 394, 403–404, italics added (*Bailey*).)

We shall return to this quote about *the ambiguous and elastic term "intent."* But first, note how more recent decisions prefer this attractive path.

In a tort case, the Supreme Court of the United States adopted the Model Penal Code's definition of recklessness. (*Farmer v. Brennan* (1994) 511 U.S. 825, 837, 839.) This definition was a "familiar and workable standard." (*Id.* at p. 839.)

In the 2016 decision in *Voisine*, Justice Kagan's majority opinion cited the Model Penal Code and distinguished between purpose, knowledge, and recklessness. (*Voisine, supra,* 579 U.S. at pp. 691–692.) Negligence was not at issue. Justices Thomas and Sotomayor vigorously dissented on other grounds but followed the same four-part method of analysis. (*Id.* at pp. 704–705.)

This is important: ten years ago, both the majority *and* the dissent had concluded the four-part analysis was the way to go.

The high court continued this uniform allegiance in *Borden v. United States* (2021) 593 U.S. 420 (*Borden*). Justice Kagan,

7

again writing for the majority, began "by setting out four states of mind, as described in modern statutes and cases, that may give rise to criminal liability. Those mental states are, in descending order of culpability: purpose, knowledge, recklessness, and negligence." (*Id.* at pp. 425–426.)

Justice Kavanaugh wrote a spirited dissent, but he also spoke in terms of the four-part hierarchy. (*Borden, supra,* 593 U.S. at pp. 451, 462–464, 467.) Justice Kavanaugh referred to these grades of culpability as "background principles of *mens rea.*" (*Id.* at p. 465.)

In short, the Supreme Court of the United States has long subscribed to this four-part approach as the best way to define the mental state a statute requires. This approach is an enlightened and improved way to think and speak clearly. It is a method of exact communication that allows differing perspectives to get to the true nub of statutory controversies.

The benefit of this method is not limited to the criminal law. The method has utility whenever the question of culpability arises, in every field of law.

For this reason, the American Law Institute has expanded its use of the four-part method beyond criminal law. The 2005 Restatement Third of Torts echoed and incrementally adapted this four-part mental state format. (See Rest.(3d) Torts: Physical and Emotional Harm § 1 [purpose and knowledge], § 2 [recklessness], § 3 [negligence].) Earlier this year, the American Law Institute approved a new draft in a different field that also followed this template. (See Rest.(3d) Torts: Defamation and Privacy Tentative Draft No. 1 § 14 [approved May 20, 2026].)

Judges too have deployed the versatile exactitude of the four-part hierarchy beyond the criminal law. (E.g., *Bullock v.*

*BankChampaign, N.A.* (2013) 569 U.S. 267, 273–274 (*Bullock*) [bankruptcy]; *Cel-Tech, supra,* 20 Cal.4th at p. 173 [unfair competition]; *People v. Freetown Holdings Co.* (2024) 100 Cal.App.5th 1195, 1212–1213 (*Freetown*) [public nuisance].)

These cases offer concrete examples of the prevalence of mental state issues outside the criminal context.

In the bankruptcy field, for instance, a federal statute states that a person cannot obtain a bankruptcy discharge from a debt for "defalcation." What does "defalcation" mean? The Supreme Court of the United States concluded "the term requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. *Thus, we include reckless conduct of the kind set forth in the Model Penal Code.*" (*Bullock, supra*, 569 U.S. at pp. 273–274, italics added.)

In unfair competition law, the California Supreme Court used the four-part method. The high court had to construe statutes outlawing sales of products "at less than cost." (*Cel-Tech, supra,* 20 Cal.4th at p. 175, 173 [quoting statutes].) To gain new customers, L.A. Cellular sold telephones below cost, losing money on telephone sales but recouping losses with increased sales of services. Competitors sued L.A. Cellular for selling phones below cost. Mental state was the crucial issue in the case: what mental state did the statutes require? Our high court wrote, " '[p]urpose' has a precise meaning. As an illustration, we may turn to the Model Penal Code. In that code, the American Law Institute drafters defined four distinct culpable mental states. ***None of the definitions uses the ambiguous word 'intent.'*** The code's two highest mental states are to act

'purposely' and to act 'knowingly.'" (*Id.* at p. 173.) The court ruled the statute required purpose, and that exonerated L.A. Cellular, which *knew* its below-cost sales would hurt competitors. But that was not its *purpose*, which was simply to increase its sales and profits. (*Id.* at pp. 175, 177, bold font added.) Knowledge was not enough.

In nuisance law, a place used to sell illegal drugs is subject to injunction. (Health & Safety Code, § 11570.) The government sought to enjoin the operation of a liquor store where drug vendors routinely sold narcotics within and in front of the store. The liquor store owner claimed to be unaware of these sales. This presented a state-of-mind issue: what mental state did the government have to prove to get an injunction? Citing the Model Penal Code, the court held the decisive " 'reason to know' standard is recklessness, not knowledge." (*Freetown, supra,* 100 Cal.App.5th at p. 1212.) "According to the esteemed authority of the American Law Institute, the four culpable mental states are purpose, knowledge, recklessness, and negligence. (Model Pen. Code, § 2.02, subd.(2).) [¶] Courts consult these definitions because they offer clarity in a field long plagued by imprecision. … [The Model Penal Code's] pathbreaking precision of mental state definitions originated in the criminal context, but the advance was of general utility because many areas of law turn on an actor's state of mind. Previous confusion on this score had not been confined to criminal law. Courts thus employ this guidance in the civil context as well." (*Ibid.*)

Bankruptcy law, unfair competition law, and nuisance law all have goals and policies that can differ considerably from criminal law. The same is true of dependency law. Yet the four-part system fits them all with ease, for it is not keyed to any goal

other than clear thinking and precise expression. Nothing about dependency law makes it vital to communicate only in ambiguous terms.

This body of decisions illustrates how the four-part system is straightforward and easy to use.

Consider a man with soapy hands who loses his grip on a plate, which falls, shatters, and cuts his wife. (See *Voisine, supra,* 579 U.S. at p. 693.) This is at most *negligence.*

It is not *recklessness.* A person acts recklessly when engaging in conduct if: (a) the person knows of the risk of harm created by the conduct or knows facts that make the risk obvious to another in the person's situation, and (b) the precaution that would eliminate or reduce the risk involves burdens that are so slight relative to the magnitude of the risk as to render the person's failure to adopt the precaution a demonstration of the person's indifference to the risk. (Rest.(3rd) Torts: Physical and Emotional Harm § 2.)

Washing plates is not known to be a risky business: no one knowingly undertakes a dangerous risk when washing up after a meal. People regard washing dishes as a routine and harmless chore. The man's mental state is not reckless.

"But now suppose a person throws a plate in anger against the wall near where his wife is standing." (*Voisine, supra,* 579 U.S. at p. 693.) That hurl counts as reckless, "even if the husband did not know for certain (or have as an object), but only recognized a substantial risk, that a shard from the plate would ricochet and injure his wife." (*Ibid.*)

Another illustration is "if a person lets slip a door that he is trying to hold open for his girlfriend." (*Voisine, supra,* 579 U.S. at p. 693.) If the swinging door hurts the girlfriend, again, the

11

man is at most negligent. No one thinks holding a door open for another involves the conscious assumption of risk. This is the same as the soapy plate accident.

But if the same person slams the door shut with his girlfriend following close behind, then he has acted recklessly. This is so "regardless of whether he thinks it absolutely sure or only quite likely that he will catch her fingers in the jamb." (*Voisine, supra,* 579 U.S. at p. 693.) The man has acted recklessly because he "knows facts that make the risk obvious to another in the person's situation." (Rest.(3rd) Torts: Physical and Emotional Harm § 2, subd. (a).)

Reckless behavior—acts undertaken with awareness of their substantial risk of causing injury, as in our hypo about hurling the plate—is more culpable than merely negligent conduct. (*Voisine, supra,* 579 U.S. at p. 694.)

The Supreme Court of the United States has written that "[r]ecklessness and negligence are less culpable mental states [than knowledge and purpose] because they instead involve insufficient concern with a ***risk*** of injury. A person acts recklessly, in the most common formulation, when he 'consciously disregards a substantial and unjustifiable risk' attached to his conduct, in 'gross deviation' from accepted standards. Model Penal Code § 2.02(2)(c); see *Voisine v. United States*, 579 U. S. 686, ——, 136 S.Ct. 2272, 2277, 195 L.Ed.2d 736 (2016). That risk need not come anywhere close to a likelihood. Speeding through a crowded area may count as reckless even though the motorist's 'chances of hitting anyone are far less [than] 50%.' 1 W. LaFave, Substantive Criminal Law § 5.4(f) (2018) (citing cases involving low-probability events). Similarly (though one more step down the mental-state hierarchy), a person acts negligently

12

if he is not but 'should be aware' of such a 'substantial and unjustifiable risk,' again in 'gross deviation' from the norm. Model Penal Code § 2.02(2)(d).  There, the fault lies in the person's simple 'failure to perceive' the possible consequence of his behavior."  (*Borden, supra,* 593 U.S. at p. 427, emphasis added.)

For the sake of clarity and to serve the public, we should use this four-part method to construe this statute.  Statutory language often "permits, even requires, judicial interpretation." (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.)  When the issue is mental state, this four-part approach is time-tested and reliable.

The majority interprets this statute, but it does not do so in a clear manner.  It needs the precision of the four-part method.

III

Today's holding is doubly imprecise.  What does the majority mean by "intentionally"?  And what mental state must the violent parent have regarding "the child's presence"?  By leaving these questions unanswered, the majority needlessly and unfortunately creates ambiguity.

A

What does the holding mean by "intentionally"?  The majority's standard states it applies when "one parent *intentionally* engages in an act of violence against the other parent … ."  "Intentionally," however, is ambiguous when left undefined.

"Intentionally," "intention," and "intent" are all forms of the same word:  *intent.*  The Supreme Court of the United States labels the term "intent" "ambiguous and elastic."  (*Bailey, supra*, 444 U.S. at p. 404.)  The California Supreme Court agrees.  (See *Cel-Tech, supra*, 20 Cal.4th at p. 173.)

13

"Intent" is ambiguous because there are four mental states.

Which level of "intent" does the majority intend? None of the four, apparently. We see this by asking this question: what possibly could be an "*un*intentional" act of violence? Presumably it would be an *involuntary* act like an arm jerking suddenly in the throes of a grand mal seizure. This type of issue is most easily and clearly treated by imposing a requirement of *voluntary* action across the board and ruling out involuntary action as a possible basis for assigning any culpability at all. The "paradigmatic" involuntary acts are when "a person physically forces the movements of another or in which one's body is in the grip of a spasm or reflex." (Kadish & Schulhofer, Criminal Law and Its Processes (6th ed. 1995) p. 175; see also Model Pen. Code, § 2.01, subd. (1) [people cannot be culpable unless their liability is based on conduct that includes a voluntary act]; *People v. Freeman* (1943) 61 Cal.App.2d 110, 115, 117–118 [epileptic loss of consciousness is a defense, because one is not culpable if at the time "he is not conscious thereof"]; *People v. Newton* (1970) 8 Cal.App.3d 359, 376 [unconsciousness is a complete defense to criminal liability].)

Involuntary actions occur without the application of human will. If a grand mal seizure made the father's arm jerk uncontrollably and violently hit his child, this would be an involuntary and thus an "unintentional" act of violence. The same would be true if a passing runner on the street collided with the father, causing him to lurch forward and violently strike his child. Aristotle gave the example of gusting wind causing an involuntary act. (Aristotle, Nicomachean Ethics (Kegan Paul etc. 4th ed. 1891) p. 58.) That reflexive jerk or falling strike or wind-blown hit would not satisfy the statute; it would be

unprecedented for the Department to invade parental rights because one parent suffered epilepsy or had been struck by a runner or been blown by the wind.  The Department would have no jurisdiction because the father would lack all culpability.

Rewording the majority's rule under this analysis, then, produces this standard:  "section 300, subdivision (a) may apply to domestic violence between a child's parents where one parent *voluntarily* engages in an act of violence against the other parent in the child's presence, and the child's exposure to such violence either inflicts serious physical harm upon the child or places the child at risk of serious physical harm."

Perhaps this is the real meaning of the majority's use of "intentionally."  We cannot be sure, because the majority does not clarify the point.  Or perhaps, following the section one of the Restatement Third of Torts: Physical and Emotional Harm, the majority equates "intentionally" with knowledge or purpose.  If so, that would rule out *reckless* domestic violence, as in the examples of the thrown plate and the slammed door.  But why do *that*?  Why this uncertainty?

B

What does the majority mean by "in the presence of the child"?  What mental state, *if any*, must the violent parent have regarding whether the child is present?

The majority implies *no* mental state is needed regarding whether the child is present.  This is the apparent meaning of the majority's statement that, "when a parent commits domestic violence in the presence of the child, that conduct may place the child at risk of serious physical harm regardless of whether the parent's mental state with respect to the child was purposeful, knowing, reckless, or negligent."

15

This rule stakes out an expansive jurisdiction for the Department. To appreciate the extent of this interpretation, consider two examples.

Example one supposes that, at the end of a family hallway, the father hits the mother at night when the child usually is asleep. Neither parent is aware their child is, however, awake and peering through a key hole in the door at the end of the hall. When the child sees the father strike the mother, the child steps back in shock, stumbles, falls down, and suffers injury. With respect to injuring the mother, the father's mental state is purposeful, which is the highest level of culpability. But with respect to whether the child is present, the father's mental state would seem not even negligent. The majority's ambiguous formulation apparently, and perhaps inadvertently, would encompass this situation.

Example two supposes the father shoves the mother against the wall, which knocks over the grandfather clock on the other side of the wall. With respect to harming the mother, the father was purposeful—the highest level of culpability. But unbeknownst to father, his napping child in the adjoining room woke up thirsty, got out of bed, and is heading to get water, only to walk near the path of the falling clock and thus risk physical injury. The father had no idea the child was awake or near the clock. Yet again the majority's ambiguous formulation apparently, and perhaps inadvertently, would encompass this situation, because the father's actions against the mother exposed the child to the risk of serious physical harm.

The Department has not sought this extent of jurisdiction. But the majority apparently has given this unrequested

prosecutorial bonus to agencies throughout the state of California.

IV

The straightforward construction of this statute would require *recklessness*, in my view.  First I present my conclusion, and then I trace the road to it.

A

Using the four-part taxonomy of purpose, knowledge, recklessness, and negligence, I interpret subdivision (a) of section 300 to read:

*The Department may assume jurisdiction over a child if a parent inflicted serious physical harm on the child or exposed the child to a substantial risk of serious physical harm.  That parent's mental state must have been at least reckless with respect to injury to the child.*

This wording clearly and precisely specifies the required mental state under subdivision (a) of section 300.  If further elaboration is needed, the Restatement Third of Torts gives it:

"A person acts recklessly in engaging in conduct if:

(a) the person knows of the risk of harm created by the conduct or knows facts that make the risk obvious to another in the person's situation, and

(b) the precaution that would eliminate or reduce the risk involves burdens that are so slight relative to the magnitude of the risk as to render the person's failure to adopt the precaution a demonstration of the person's indifference to the risk." (Rest.(3d) Torts:  Physical & Emotional Harm § 2.)

B

The road to this conclusion starts, as does every exercise of statutory interpretation, with the text of the statute.

17

I italicize the two key statutory words:  "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:  (a) The child has suffered, or there is a substantial *risk* that the child will suffer, serious physical harm inflicted *nonaccidentally* upon the child by the child's parent or guardian."  (Welf. & Inst. Code, § 300, subd. (a) (Section 300(a)).)

The statutory word "nonaccidentally" refers to the state of mind of the parent or guardian.  But what does this mental state word mean?  That is the crux of this case.  (I also italicized "risk," and I will come back to that.  Readers, please remember that word "risk.")

The sensible approach is to use the American Law Institute's four-part method to construe this word "nonaccidental."  This approach is better than relying on Black's Law Dictionary or on nonlegal dictionaries.

"[D]ictionaries must be used as sources of statutory meaning *only with great caution*.  'Of course it is true that the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing:  be it a statute, a contract, or anything else.  But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.' *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.1945) (L. Hand, J.).  '[T]he choice among meanings [of words in statutes] must have a footing more solid than a dictionary—which is a museum of words, an historical catalog

18

rather than a means to decode the work of legislatures.' … Dictionary definitions are acontextual, whereas the meaning of sentences depends critically on context, including all sorts of background understandings … . A sign in a park that says 'Keep off the grass' is not properly interpreted to forbid the grounds crew to cut the grass." (*U.S. v. Costello* (7th Cir. 2012) 666 F.3d 1040, 1043–1044.)

These sound observations are by Judge Posner. When you get Judge Posner quoting Judge Learned Hand, it is worth paying attention.

Rather than relying on dictionaries, I suggest starting with the American Law Institute's background understanding. Over the course of generations, the American Law Institute repeatedly has devoted highly skilled resources to solving the very problem we confront today: what is the best way to define the mental state a statute requires? This interpretive tool is steadfastly impartial, dead on point, and first rate. It is free. Let's use it.

Beginning, then, with this four-part taxonomy, we observe the Legislature did not define "nonaccidentally." So we must. And "nonaccidentally" fits easily into the four-part system of purpose, knowledge, recklessness, and negligence. "Nonaccidental" requires more than negligence. The typical case involving an *accident* is the classic negligence suit about whether the traffic light was red or green, and so forth. Therefore, "*non*accidental" must be different from negligence. Negligence is not enough. We must ascend the ladder of culpability. But how far should we climb? The next rung is recklessness, and that candidate is worthy.

The statute includes the word "risk," and the mental state category of recklessness is consonant with this concept.

19

"Recklessness" best embodies this legislative intent. A fortiori, knowledge and purpose would be more than enough.

Using recklessness makes perfect sense of precedent. A pair of precedents give textbook examples of reckless conduct satisfying this statute.

The first precedent is *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 598–601 (*Giovanni F.*). There the one-year-old child was a passenger in the back seat. The father drove with one hand on the steering wheel and used his other hand to hit and choke the mother. The father thereby put the child at substantial risk of serious physical harm, because the father risked a crash. The father's mental state was *recklessness*.

When you are preoccupied with trying to strangle and beat your wife, you are chancing a wreck that could injure everyone, including your child passenger. The danger is plain. The father "knows facts that make the risk obvious to another in the person's situation." (Rest.(3d) Torts: Physical & Emotional Harm § 2, subd. (a).)

The father in *Giovanni F.* was more culpable than *negligent*. His driving was more blameworthy than a merely careless driving. But the father's state of mind regarding injury to the child also was less culpable than a father who *knowingly* or *purposely* harms the child.

The father did not act "knowing that the consequence is *substantially certain* to result," which is the standard for a *knowing* state of mind. (Rest.(3d) Torts: Physical & Emotional Harm § 1, subd. (b), italics added.) A car crash was not a "substantially certain" consequence. It was merely a risk. It was a serious and dangerous risk. But it was not substantially

20

certain, and that is the wording the American Law Institute has worked out as the definition of *knowing* culpability.

Nor did the father have the *purpose* of hurting the child. The person he was trying to hurt was the mother. He could well have the goal of hurting the mother but be unhappy that his actions were endangering the child.

The conduct thus was merely reckless.

*Giovanni F.* held the father's conduct satisfied the statute. Without stating it in so many words, *Giovanni F.* effectively held reckless conduct was enough to trigger this statute.

We thus see that this four-part tool allows us to zero in on culpability with impressive precision. Our analysis has determined the exact level of culpability in *Giovanni F.*, and it was enough for Section 300(a).

The second precedent is *In re M.M.* (2015) 240 Cal.App.4th 703, 720 (*M.M.*). *Both* parents in that case were reckless with respect to injury to their child. The "mother hit father while he was holding minor." (*Ibid.*) The father also was reckless with respect to injuring the child. When the mother was pregnant, the father pushed her, "causing her to fall to the floor. Mother confided she was afraid of losing her baby as a result of this incident." (*Ibid.*) And both parents were *mutually* reckless: the "domestic violence included father choking mother while holding minor; father throwing mother into a piano, a table and onto the floor *while minor was 'at their feet'*; father pinning mother on the floor at least two times; father breaking mother's phone; and mother hitting and kicking father and shredding his shirt." (*Id.* at p. 706, italics added.) Battling each other while your child is *at your feet* poses a risk of harm to the child. That is reckless: both parents knew facts that make the risk to the child obvious to

21

another in that situation. (Rest.(3d) Torts: Physical & Emotional Harm § 2, subd. (a).)

In effect but without expressly saying so, *M.M.* also held that reckless conduct satisfied Section 300(a).

Precedent thus supports identifying recklessness as the required mental state for this statute. I am aware of no contrary case law.

The recklessness standard also meshes with the decision in *In re Cole L.* (2021) 70 Cal.App.5th 591 (*Cole L*). In that case, a witness gave this description: "It was not an altercation to the extent that the police made it out to be. They were having an argument over a phone. [The mother] was trying to take the phone away from [the father] … . [T]hey were going back and forth and some pushing was going on. *The children were asleep in another room, not even in their presence.*" (*Id.* at p. 598, italics added.) Obviously, the parent's mental state was not purposeful, knowing, or reckless with respect to injury to children *asleep in another room*. This standard fits the facts of *Cole L.*

In sum, the apt statement of the required mental under Section 300(a) is this:

*The Department may assume jurisdiction over a child if a parent inflicted serious physical harm on the child or exposed the child to a substantial risk of serious physical harm. That parent's mental state must have been at least reckless with respect to injury to the child.*

\* \* \* \* \*

22

I join the result because the father's assault on his wife recklessly endangered the child.  I do not join the reasoning, which creates ambiguity and which grants more jurisdiction to the Department than it has requested.


WILEY, J.